**POST, POLAK, GOODSELL & STRAUCHLER, P.A.**
Frederick B. Polak (028911980)
Michael J. Martelo (079282013)
425 Eagle Rock Avenue, Suite 200
Roseland, New Jersey 07068-1717
T. (973) 228-9900
F. (973) 994-1705
Attorneys For Plaintiff, Heather J. Duncan
Our File No. 5293.00001

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HEATHER J. DUNCAN,<br><br>               Plaintiff,<br><br>vs.<br><br>PAULAUR CORPORATION, MITCHELL STEFANIAK, CLIFFORD RODKEY, ANDREW TOSCANO, PAULETTE TOSCANO, MEGAN THOMAS, STEVENS & LEE, P.C., JOHN DOE CORPORATIONS 1-10, and JOHN DOE INDIVIDUALS 1-10.<br><br>               Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br><br>*Demand for Jury Trial*<br><br>*Document Filed Electronically* |

Plaintiff, Heather J. Duncan, having an address at P.O. Box 1029, Cardiff, California, by way of Complaint against defendants Paulaur Corporation, Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, Paulette Toscano, Megan Thomas, Esq., Stevens & Lee, P.C., John Doe Corporations 1-10, and John Doe Individuals 1-10, says:

**NATURE OF ACTION**

1.      This is a civil action arising from the sale of an ownership interest in a closely-held corporation that would not have occurred but for the non-lawyer defendants' fraudulent conduct and/or breaches of fiduciary duty and/or the lawyer defendants' malpractice.

2.     Plaintiff, Heather J. Duncan ("Plaintiff" or "Heather"), seeks damages and other appropriate relief arising from such fraud, breaches of fiduciary duty, and malpractice.

## JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction, pursuant to 28 U.S.C. § 1331, because this Complaint alleges a claim arising under the laws of the United States, specifically, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

4.     This Court also has subject-matter jurisdiction, pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States.  Plaintiff is a citizen of California, while each defendant is a citizen of either New Jersey or Pennsylvania.

5.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and/or omissions giving rise to the claims set forth herein occurred in this District.

## THE PARTIES

6.     Plaintiff, Heather J. Duncan, currently resides in San Diego County, California, and has an address at P.O. Box 1029, Cardiff, California.  Not long ago, she resided in Bucks County, Pennsylvania with her husband, Michael Toscano ("Michael"), whom she married in July 2006. He unexpectedly passed away on October 17, 2014.  At the time of his passing, he was one of Paulaur Corporation's directors, serving as its Vice President of Engineering.  He was also one of its shareholders, owning a 42.50% interest.

7.     Defendant Paulaur Corporation ("Paulaur" or the "Corporation") is a closely-held corporation organized and existing under the laws of the State of New Jersey.  Michael's father,

Vincent Toscano, founded Paulaur in May 1980. Its office and principal place of business is located at 105 Melrich Road, Cranbury, New Jersey. It manufactures a diverse line of food ingredients, including coated chips, colored sugar, nonpareils, sprinkles, and syrups, which it markets to the both the food and pharmaceutical industries.

8. Defendant Mitchell Stefaniak ("Stefaniak") is a certified public accountant, financial advisor, and tax return preparer, who, upon information and belief, currently resides at 43 Ray Dwier Drive, Hamilton, New Jersey. At all relevant times, he was one of Paulaur's directors, serving as its Vice President of Finance and Chief Financial Officer, and one of its shareholders, owning a 7.50% interest.

9. Defendant Clifford Rodkey ("Rodkey"), who, upon information and belief, currently resides at 18 Hemlock Hill Road, Jackson Township, New Jersey, was, at all relevant times, one of Paulaur's directors, serving as its Vice President of Quality Assurance, and one of its shareholders, owning a 7.50% interest.

10. Defendant Andrew Toscano ("Andrew") is Michael's brother, who, upon information and belief, currently resides at 400 Collins Grant Court, Yardley, Pennsylvania. At all relevant times, he was one of Paulaur's directors, serving as its Vice President of Manufacturing, and one of its shareholders, owning a 42.50% interest.

11. Defendant Paulette Toscano ("Paulette") is Michael's mother, who, upon information and belief, currently resides at 2 Lakeshore Drive, West Windsor, New Jersey. At all relevant times, she was one of Paulaur's directors, serving as its President. She is the widow of Paulaur's founder, Vincent Toscano. Together, they had four sons, Steven Toscano, Lawrence Toscano, Andrew Toscano, and Michael Toscano. Steven and Michael are deceased. All four sons have been involved in Paulaur's affairs, albeit to different degrees and at different times.

12.     Defendant Megan Thomas, Esq. ("Thomas") is an attorney licensed to practice in the State of New Jersey. At all relevant times, she was an Of Counsel to Stevens & Lee, P.C. at its Princeton office. In November 2014, Heather retained Thomas based on Stefaniak's advice.

13.     Defendant Stevens & Lee, P.C. ("Stevens & Lee") is a full-service law firm with approximately 150 attorneys and 13 offices, including offices in Delaware, New Jersey, New York, Pennsylvania, and South Carolina. At all relevant times, Stevens & Lee employed Defendant Megan Thomas, Esq. as an Of Counsel at its Princeton office located at Princeton Pike Corporate Center, 100 Lenox Drive, Suite 200, Lawrenceville, New Jersey.

## FACTUAL BACKGROUND

### The Death of Michael Toscano

14.     On October 17, 2014, Michael Toscano passed away.

15.     Michael's death was unexpected; he was only 49 years old.

16.     Michael is survived by his widow, Plaintiff, Heather J. Duncan.

17.     Michael's abrupt death left Heather in a state of shock.

18.     In the months following Michael's death, Heather was overcome with grief and despair.

19.     Heather is the Executrix of Michael's Estate.

20.     The assets in Michael's Estate included his ownership interest in Defendant Paulaur Corporation.

21.     For many years, Michael was a significant contributor to Paulaur's success.

22.     When Michael met Heather, in June 2005, he was one of Paulaur's directors.

23.     When Michael died, he was still one of Paulaur's directors.

24.     At the time of Michael's death, his fellow directors were Defendants Clifford Rodkey, Mitchell Stefaniak, Andrew Toscano, and Paulette Toscano.

25.     At the time of Michael's death, his fellow shareholders were Rodkey, Stefaniak, and Andrew.

### Defendant Mitchell Stefaniak's Relationship with Plaintiff, Heather J. Duncan, and Michael Toscano

26.     Stefaniak was Paulaur's Vice President of Finance and Chief Financial Officer.

27.     Stefaniak's relationship with Michael Toscano was not limited solely to that of a business partner.

28.     Stefaniak was also Michael's financial advisor and tax preparer.

29.     Likewise, Stefaniak was Heather's financial advisor and tax preparer.

30.     From 2006 until Michael's death, Stefaniak prepared the tax returns of, and provided financial advice to, both Michael and Heather.

31.     Stefaniak was also seemingly Michael's and Heather's friend, and, thus, someone whom Heather thought she could trust.

32.     In light of Stefaniak's multiple roles, he possessed intimate knowledge of Michael's and Heather's finances.

33.     Prior to November 21, 2014, in the weeks following Michael's death, Andrew told Heather, on a number of occasions, to rely on and trust Stefaniak's advice.

34.     Prior to November 21, 2014, in the weeks following Michael's death, Paulette told Heather, on a number of occasions, to rely on and trust Stefaniak's advice.

35.     Following Michael's death, Heather communicated with Stefaniak to obtain advice in connection with a range of financial issues arising from Michael's death.

36.     Stefaniak provided Heather with financial advice, including, for instance, how she should deal with Michael's life insurance policies and bank accounts.

37.     Heather had never administered an estate before Michael's death.

38.     Given the many issues Heather faced following Michael's death, she retained counsel to assist her.

39.     Heather initially retained an attorney in Bucks County, Pennsylvania.

40.     But Heather became concerned about the soundness of the advice she was receiving from that attorney.

41.     Heather informed Stefaniak of her concerns, and he advised her to retain Defendant Megan Thomas of Defendant Stevens & Lee, P.C.

42.     Heather was familiar with Thomas because Thomas had previously represented Michael.

43.     Stefaniak scheduled a time for Heather to meet with Thomas on November 11, 2014.

**The November 11, 2014 Meeting at the Princeton Office of Stevens & Lee, P.C.**

44.     On November 11, 2014, Heather met with Thomas and Stefaniak in a conference room at the Princeton office of Stevens & Lee.

45.     Only Heather, Thomas, and Stefaniak attended the November 11 meeting.

46.     At the time of the November 11 meeting, Heather was still in a state of shock, was still overwhelmed with grief, and could not stop herself from crying.

47.     Heather found it incredibly difficult to focus on anything other than Michael's untimely death at the November 11 meeting. She could not help but ask Stefaniak questions about Michael's final days at Paulaur, hoping to make some sense out of what had happened.

48. Heather had no idea what her responsibilities would be as Michael's Executrix. So, during the November 11 meeting, she asked questions about those responsibilities.

49. Heather also asked questions about financial planning and estate taxes.

50. In answering Heather's questions, Thomas explained that she would work with Stefaniak to assist Heather.

51. Thomas further explained that she and Stefaniak had previously worked together under similar circumstances.

52. Following the death of Steven Toscano, in November 2010, Stevens & Lee worked with Stefaniak to assist Steven's widow, Lisa Toscano, in administering his estate.

53. Likewise, following the death of Vincent Toscano, in February 2012, Stevens & Lee worked with Stefaniak to assist Vincent's widow, Paulette, in administering his estate.

54. During the November 11 meeting, Thomas never asked Stefaniak to leave the conference room.

55. During the November 11 meeting, Thomas never provided Heather with an opportunity to ask questions alone.

56. Stefaniak was in the conference room throughout the entire November 11 meeting.

57. After answering some of Heather's questions, Thomas assured Heather that things would be alright, and announced, unexpectedly, that Stefaniak had a buyout proposal ready to give her for the purchase of Michael's interest in Paulaur.

58. It came as a surprise to Heather that Stefaniak had a buyout proposal ready.

59. Although Heather felt somewhat blindsided by the sudden buyout proposal, Thomas's presence at the meeting was reassuring to Heather.

60.     Heather understood that Thomas had reviewed the terms of the buyout proposal before the November 11 meeting.

61.     That understanding was substantiated when Thomas extolled the purported virtues of the buyout proposal, along with Stefaniak, before Heather had even had a chance to see it.

62.     Thomas and Stefaniak each represented to Heather that Heather would be pleased with the buyout proposal.

63.     Thomas and Stefaniak each represented to Heather that Heather would be well taken care of under the buyout proposal.

64.     Also, Thomas and Stefaniak each represented to Heather that the buyout proposal was "generous."

65.     Thomas advised Heather to trust Stefaniak.

66.     Heather asked Stefaniak, in Thomas's presence, how Michael's interest in Paulaur would be valued.

67.     Stefaniak answered that a shareholders' agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price, and, therefore, Heather had no right to negotiate any terms.

68.     Thomas reiterated Stefaniak's representation that a shareholders' agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

69.     When Heather sought further clarification, all Thomas and Stefaniak did was repeat the same representation.

70.     Neither Thomas nor Stefaniak provided Heather with a copy of any shareholders' agreement during the November 11 meeting.

71.     Thomas never offered to review any shareholders' agreement independently with Heather either during the November 11 meeting or at any time thereafter.

72.     Just as Stefaniak was about to present Heather with the terms of the buyout proposal, Thomas announced that she had to leave to attend another meeting.

73.     Before Thomas left to attend the other meeting, Heather requested that Thomas stay.

74.     But Thomas responded that she had to attend the other meeting and reiterated that Heather could trust Stefaniak.

75.     Once Thomas left the conference room, Stefaniak presented Heather, for the first time, with a one-page spreadsheet captioned "Stock Buy-Back Proposal."

76.     No one had provided Heather with the Stock Buy-Back Proposal beforehand.

77.     Stefaniak went over the Stock Buy-Back Proposal with Heather.

78.     The Stock Buy-Back Proposal noted that, pursuant to the terms of a shareholders' agreement, the price per share was "$28.50" and that, as a result, she was entitled to receive only $1,884,603 for Michael's interest in Paulaur.

79.     The Stock Buy-Back Proposal then noted that, pursuant to its terms, Heather would instead receive $3,500,000 for Michael's interest in Paulaur, of which $2,000,000 would be paid in cash immediately, while the remaining $1,500,000 would be paid out over ten years, at a three percent interest rate, with a monthly payment of $14,484.11.

80.     In reliance on Stefaniak's and Thomas's separate representations about the binding effect of a shareholders' agreement, Heather was led to believe that she had no better option than to accept the Stock Buy-Back Proposal.

81.     In reliance on Stefaniak's and Thomas's separate representations about the binding effect of a shareholders' agreement, Heather was further led to believe that the Stock Buy-Back Proposal was "generous."

82.     Stefaniak never advised Heather to seek independent advice in connection with the sale of Michael's interest in Paulaur.

83.     Stefaniak never advised Heather of any conflict of interest he had in connection with the sale of Michael's interest in Paulaur.

84.     Thomas never thereafter discussed the terms of the Stock Buy-Back Proposal with Heather

85.     In fact, Thomas and Stefaniak each misrepresented that a shareholders' agreement predetermined the price of any sale of Michael's interest in Paulaur.

86.     Shortly after leaving the November 11 meeting, Heather called Andrew to thank him for what Stefaniak and Thomas had each represented to Heather was a "generous" buyout proposal.

87.     In thanking Andrew, Heather expressed her appreciation for his willingness to agree to her receipt of more than what Stefaniak and Thomas had each represented Heather was otherwise entitled to receive under a shareholders' agreement.

88.     On or about November 12, 2014, Heather called Rodkey to thank him for what Stefaniak and Thomas had each represented to Heather was a "generous" buyout proposal.

89.     In thanking Rodkey, Heather expressed her appreciation for his willingness to agree to her receipt of more than what Stefaniak and Thomas had each represented Heather was otherwise entitled to receive under a shareholders' agreement.

**The Amended and Restated Shareholders' Agreement dated May 1, 2006**

90.     On or about May 1, 2006, Paulaur's shareholders entered into a shareholders' agreement, namely, the Amended and Restated Shareholders' Agreement (the "Shareholders' Agreement").

91.     As relevant here, the Shareholders' Agreement granted Paulaur—and only Paulaur—the right to purchase and redeem a deceased shareholder's shares. It granted no such right to a deceased shareholder's fellow shareholders.

92.     As of May 1, 2006, Paulaur had two classes of stock, Class A and Class B.

93.     The Shareholders' Agreement set a purchase price for only Class A and Class B stock. Specifically, the Certificate of Value appended thereto set the purchase price for each share of Class A and Class B stock at $28.50.

94.     The Shareholders' Agreement contemplated that the purchase price might be changed.

95.     The Shareholders' Agreement authorized only Class A shareholders to set a new purchase price for stock.

96.     More specifically, Paragraph 12.2 of the Shareholders' Agreement provides:

> Subsequent to the date hereof, at such time as the **SHAREHOLDERS** holding Class A voting **STOCK** shall, in their sole discretion determine, the **SHAREHOLDERS** holding Class A voting **STOCK** shall meet with the chief financial officer of the **CORPORATION** and/or such outside advisors as such **SHAREHOLDERS** deem necessary, to determine a new purchase price for the **STOCK**. In determining said **PURCHASE PRICE**, each such **SHAREHOLDER** shall have one vote for each share of Class A voting **STOCK** held, and only a unanimous decision shall govern for decreasing or increasing the **PURCHASE PRICE**. Any new **PURCHASE PRICE** determined pursuant to this Paragraph 12.2 shall take effect prospectively and remain in effect until changed pursuant to this Paragraph 12.2.

97.     Thus, absent the existence of Class A shareholders, there is no mechanism to set a new purchase price for stock under the Shareholders' Agreement.

98.     On May 31, 2011, Paulaur's Board of Directors and Shareholders, which then included Stefaniak, Rodkey, Andrew, and Paulette, approved an amendment to the Corporation's Certificate of Incorporation, namely, the Certificate of Amendment of Certificate of Incorporation of Paulaur (the "May 2011 Amendment to Paulaur's Certificate of Incorporation").

99.     The May 2011 Amendment to Paulaur's Certificate of Incorporation reclassified all outstanding stock as "common stock," eliminating the existence of Class A and Class B stock.

100.    Therefore, about five years after Paulaur's shareholders entered into the Shareholders' Agreement, the Corporation's Class A and Class B stock ceased to exist.

101.    While the Certificate of Value dated May 1, 2006 appended to the Shareholders' Agreement set the purchase price for Class A and Class B stock at $28.50 per share, it did not set any purchase price for "common stock."

102.    Thus, the effect of the May 2011 Amendment to Paulaur's Certificate of Incorporation was to invalidate the Certificate of Value appended to the Shareholders' Agreement, resulting in there no longer being a set purchase price for the Corporation's stock.

103.    The Shareholders' Agreement was prepared by Robert D. Frawley, Esq. ("Frawley").

104.    When Frawley prepared the Shareholders' Agreement, he was an Of Counsel to Defendant Stevens & Lee, P.C. at its Princeton office.

105.    At no time during the November 11 meeting did Thomas advise Heather that her law firm, Stevens & Lee, had prepared the Shareholders' Agreement.

106.    At no time during the November 11 meeting did Thomas advise Heather to have another law firm counsel her as to whether the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

### The November 21, 2014 Get Together at Heather Duncan's House

107.    On November 21, 2014, Heather hosted a get together at her house in Bucks County for Paulaur's shareholders and officers, along with their respective significant others.

108.    The attendees included Stefaniak, Rodkey, Andrew, Paulette, and Paulaur employee Amanda Lewey ("Lewey").

109.    The get together began at about 4:00 p.m.

110.    The primary purpose of the get together was to celebrate Michael's life.

111.    The get together was an emotional one for Heather.  She was still grieving over Michael's death and the presence of his family without him there was especially hard on her.

112.    Heather cried multiple times during the get together.

113.    The get together was intended to be a relatively short affair because dinner reservations had been made at a restaurant in Bucks County, Pennsylvania for that evening.

114.    During the get together, a number of the attendees, including Stefaniak, Rodkey Paulette, and Lewey, congregated in Heather's kitchen.

115.    While in Heather's kitchen, Stefaniak and Paulette presented Heather with a pre-tabbed bundle of papers.

116.    Heather was afforded no opportunity to review, and had not reviewed, the papers beforehand.

117.    Stefaniak and Paulette urged Heather to hurry up and sign the papers, claiming that they did not want to be late to dinner.

118.     Heather then sat at her kitchen table and was presented with the signature page of certain papers, each of which had been tabbed.

119.     Relying on the separate representations from Stefaniak and Thomas that a shareholders' agreement controlled the purchase of her husband's shares, including the purchase price per share set forth in that agreement, Heather signed each document presented to her.

120.     As Heather signed the papers, Paulette was standing directly over and behind her.

121.     As Heather signed the papers, Stefaniak was seated immediately to her left.

122.     As Heather signed the papers, Lewey was seated immediately to her right, ready to notarize each of her signatures.

123.     The papers included four separate documents:  (1) a Common Stock Power; (2) a Share Redemption Agreement; (3) a Share Purchase Agreement; and (4) another Common Stock Power.

124.     Although Heather executed each document during the get together on November 21, 2014, each document is backdated to October 18, 2014.

125.     The first Common Stock Power assigned and transferred the interest of Michael's Estate in Paulaur, then comprising 41,565 shares of common stock, to Heather.

126.     The Share Redemption Agreement provides that "[Heather] agrees to sell to [Paulaur] and the Corporation agrees to buy from [Heather], the Shares," specifically, 12,235 shares of common stock once belonging to Michael, "for a redemption price of Two Million, and no/100 Dollars ($2,000,000.00) . . . ."

127.     The Share Redemption Agreement further provides that "[p]ayment will be made by delivery of a cash down payment of $500,000 and a promissory note in the principal amount of $1,500,000, bearing interest at 3.0% payable in 120 equal monthly installments of $14,484.11

each, commencing January 1, 2015, prepayable in whole or in part at any time without premium or penalty."

128.　The Share Redemption Agreement was executed by Stefaniak, on behalf of Paulaur, and Heather.

129.　Paulaur's directors, Stefaniak, Rodkey, Andrew, and Paulette, approved the Corporation's execution of the Share Redemption Agreement through their execution of the Unanimous Consent in Lieu of a Meeting of Board of Directors of Paulaur Corporation backdated to October 18, 2014.

130.　In doing so, Stefaniak, Rodkey, Andrew, and Paulette each participated in the representations contained in the Share Redemption Agreement, including the purported waiver of the Shareholders' Agreement, which led one to believe that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest, including the purchase price.

131.　The Share Purchase Agreement provides:

[Heather] agrees to sell to the [sic] [Rodkey] and [Stefaniak], and [Rodkey] and [Stefaniak] agree to buy from [Heather], the shares as follows:

| Purchaser | Number of Shares | Purchase Price |
|---|---|---|
| [Rodkey] | 14,665 | $750,000 |
| [Stefaniak] | 14.665 [sic] | $750,000 |

132.　The Share Purchase Agreement further provides that "[p]ayment will be made by delivery at closing of a check from or on behalf of each of [Rodkey] and [Stefaniak], each check in the amount of Seven Hundred Fifty Thousand and no/100 ($750,000)."

133.　The Share Purchase Agreement was executed by Stefaniak, Rodkey, and Heather.

134.    In accordance with the Share Redemption Agreement and the Share Purchase Agreement, the second Common Stock Power assigned and transferred Heather's interest in Paulaur, then comprising 41,565 shares of Paulaur common stock, to Paulaur, Rodkey, and Stefaniak.  More specifically, Paulaur received 12,235 shares, Rodkey received 14,665 shares, and Stefaniak received 14,665 shares.

135.    In aggregate, pursuant to the Share Purchase Agreement and Share Redemption Agreement, Heather received approximately $3,500,000 in exchange for Michael's interest in Paulaur.

136.    However, according to Paulaur's own subsequent appraisal, the fair market value of Michael's interest in Paulaur was approximately $6,010,000.

137.    Upon information and belief, Paulaur's appraiser undervalued the fair market value of Michael's interest in Paulaur.  His interest was worth more than $6,010,000.

138.    In any event, the fair value of Michael's interest in Paulaur was worth more than $3,500,000.

139.    Paragraph 8.5 of the Shareholders' Agreement provides that the closing of Paulaur's purchase of a deceased shareholder's interest in the corporation "shall take place at the office of the **CORPORATION** at a date designated by the **CORPORATION** which shall be not more than sixty (60) days following the date of the qualification of the personal representatives and not less than thirty (30) days following such date."

140.    After Heather executed the documents, Stefaniak, Rodkey, Andrew, and Paulette exhibited antagonistic behavior toward Heather for the rest of the evening.  They shut Heather out of their conversations and ignored her.

## COUNT I

## BREACH OF FIDUCIARY DUTY

141.    Plaintiff, Heather J. Duncan, repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

142.    Defendant Paulaur Corporation is a closely held corporation.

143.    Michael Toscano was among Paulaur's directors and shareholders at the time of his death.

144.    Defendants Mitchell Stefaniak, Clifford Rodkey, and Andrew Toscano were also among Paulaur's directors and shareholders at the time of Michael's death.

145.    Likewise, Defendant Paulette Toscano was among Paulaur's directors at the time of Michael's death.

146.    Directors of a closely held corporation owe shareholders a fiduciary duty of the utmost good faith and loyalty.

147.    Likewise, shareholders in a closely held corporation owe fellow shareholders a fiduciary duty of the utmost good faith and loyalty.

148.    Upon Michael's death, his Estate acquired his interest in Paulaur.

149.    The Executrix of Michael's Estate is Heather, his widow.

150.    Since Michael's death, Heather has stood in his shoes as the Executrix of his Estate.

151.    Stefaniak, Rodkey, Andrew, and Paulette each owed Heather a fiduciary duty of the utmost good faith and loyalty.

152.    Stefaniak also owed Heather a fiduciary duty as her financial advisor and tax preparer.

153. The fiduciary duty of the utmost good faith and loyalty forbids a closely held corporation's directors and shareholders from acting out of avarice, expedience, or self-interest.

154. Stefaniak, Rodkey, Andrew, and Paulette each acted out of avarice, expedience, and self-interest when they each failed to disclose to Heather that no shareholders' agreement predetermined the terms of any sale of Michael's interest in Paulaur.

155. Stefaniak, Rodkey, Andrew, and Paulette each acted out of avarice, expedience, and self-interest when they executed the Unanimous Consent in Lieu of a Meeting of Board of Directors of Paulaur Corporation, which document authorized Paulaur's purchase of Michael's common stock pursuant to the Share Redemption Agreement. In doing so, they each participated in representations contained in the Share Redemption Agreement, including the purported waiver of the Shareholders' Agreement, which led one to believe that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest, including the purchase price.

156. As Paulaur's directors, Stefaniak, Rodkey, Andrew, and Paulette approved of presenting Heather with the Stock Buy-Back Proposal, either tacitly or explicitly, and, in doing so, they each acted out of avarice, expedience, and self-interest.

157. Likewise, Stefaniak acted out of avarice, expedience, and self-interest, when, on November 11, 2014, he presented Heather with the Stock Buy-Back Proposal and represented to her that a shareholders' agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

158. At the time of Michael's death, the Shareholders' Agreement did not predetermine the purchase price of any sale of Michael's interest in Paulaur.

159. Stefaniak, Rodkey, Andrew, and Paulette were among the shareholders who entered into the Amended and Restated Shareholders' Agreement, on May 1, 2006, and were, thus, familiar with its terms.

160. On its face, the Shareholders' Agreement was limited in scope. It granted Paulaur—and only Paulaur—the right to purchase and redeem a deceased shareholder's shares. So it did not govern the terms of any sale of a deceased shareholder's interest to another shareholder.

161. Moreover, at the time of Michael's death, the purchase price set forth in the Certificate of Value dated May 1, 2006 appended to the Shareholders' Agreement was no longer binding upon any sale of a deceased shareholder's interest.

162. The Certificate of Value set a purchase price for only Class A and Class B stock.

163. In May 2011, Stefaniak, Rodkey, Andrew, and Paulette, in addition to Paulaur's other directors and shareholders, approved an amendment to Paulaur's Certificate of Incorporation. It reclassified all outstanding shares as "common stock," and, thereby, eliminated all Class A and Class B stock.

164. The Certificate of Value appended to the Shareholders' Agreement did not set a purchase price for such "common stock."

165. Thus, following the approval of the May 2011 Amendment to Paulaur's Certificate of Incorporation, it was impossible to set a purchase price for such "common stock," pursuant to the Shareholders' Agreement.

166. Having entered into the Shareholders' Agreement, and having approved the May 2011 Amendment to Paulaur's Certificate of Incorporation, Stefaniak, Rodkey, Andrew, and Paulette each knew that the purchase price set forth in the Certificate of Value dated May 1, 2006

appended to the Shareholders' Agreement was not binding at the time of Michael's death. Specifically, they each knew that the Certificate of Value set a purchase price for only Class A and Class B stock. They each further knew that such stock ceased to exist because the May 2011 Amendment to Paulaur's Certificate of Incorporation reclassified such stock as "common stock." Thus, they each further knew that the price per share set forth in the Certificate of Value did not control the purchase price for a deceased shareholder's "common stock."

167. In furtherance of the goal of deceiving Heather into selling Michael's interest in Paulaur at price far below fair value, Stefaniak advised Heather to retain Defendant Megan Thomas, an Of Counsel to Defendant Stevens & Lee, P.C. Stefaniak knew that Stevens & Lee had prepared the Shareholders' Agreement.

168. On or about November 11, 2014, Heather thanked Andrew for what Stefaniak had represented to her were "generous" buyout terms.

169. In thanking Andrew, Heather expressed her appreciation for his willingness to agree to her receipt of more than what Stefaniak misrepresented she was otherwise entitled to receive under the Shareholders' Agreement.

170. Andrew failed to correct Stefaniak's misrepresentations about the Shareholders' Agreement.

171. On or about November 12, 2014, Heather thanked Rodkey for what Stefaniak had represented to her were "generous" buyout terms.

172. In thanking Rodkey, Heather expressed her appreciation for his willingness to agree to her receipt of more than what Stefaniak misrepresented she was otherwise entitled to receive under the Shareholders' Agreement.

173.     Rodkey failed to correct Stefaniak's misrepresentations about the Shareholders' Agreement.

174.     Had Stefaniak, Rodkey, Andrew, and Paulette not failed to disclose both the limited scope of the Shareholders' Agreement and the nonbinding effect of the purchase price set forth in the Certificate of Value appended thereto, Heather would not have entered into the Share Redemption Agreement and Share Purchase Agreement on November 21, 2014.

175.     Had Stefaniak, Rodkey, Andrew, and Paulette not executed the Unanimous Consent in Lieu of a Meeting of Board of Directors of Paulaur Corporation, which document gave their approval to the Share Redemption Agreement's misrepresentation that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest, Heather would not have entered into the Share Redemption Agreement on November 21, 2014.

176.     Had Rodkey and Andrew not failed to correct Stefaniak's misrepresentations about the Shareholders' Agreement, she would not have entered into the Share Purchase Agreement and Share Redemption Agreement.

177.     Had Stefaniak not misrepresented that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price, Heather would not have entered into the Share Redemption Agreement and Share Purchase Agreement on November 21, 2014.

178.     In aggregate, pursuant to the Share Purchase Agreement and Share Redemption Agreement, Heather received approximately $3,500,000 in exchange for Michael's interest in Paulaur, that is, 41,565 shares of Paulaur common stock.

179.     However, according to Paulaur's own subsequent appraisal, the fair market value of Michael's interest in Paulaur was approximately $6,010,000.

180. Upon information and belief, Paulaur's appraiser undervalued the fair market value of Michael's interest in Paulaur. The fair market value of his interest was worth more than $6,010,000.

181. Moreover, the fair value of Michael's interest in Paulaur was worth more than $6,010,000.

182. Because Stefaniak, Rodkey, Andrew, and Paulette deceived Heather into entering into the Share Purchase Agreement and Share Redemption Agreement, she received far less for Michael's interest in Paulaur than it was worth.

183. John Doe Individuals 1-10, individuals presently unknown to Heather, participated in the above-referenced breaches of fiduciary duty.

**WHEREFORE**, Plaintiff, Heather J. Duncan, demands judgment against Defendants Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, Paulette Toscano, and John Doe Individuals 1-10 for damages, interest, attorney's fees, filing fees, costs, and any other relief that the Court deems just and appropriate.

## COUNT II

### AIDING & ABETTING BREACH OF FIDUCIARY DUTY

184. Plaintiff, Heather J. Duncan, repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

185. As alleged in the preceding paragraphs, Defendant Mitchell Stefaniak breached his fiduciary duty to Heather by deceiving her into entering into the Share Purchase Agreement and Share Redemption Agreement on November 21, 2014.

186. As alleged in preceding paragraphs, Stefaniak's breach of fiduciary duty resulted in Heather receiving far less for Michael Toscano's interest in Paulaur than it was worth.

187. If Defendants Clifford Rodkey, Andrew Toscano, Paulette Toscano, and John Doe Individuals 1-10 did not themselves breach a fiduciary duty to Heather, they aided and abetted Stefaniak's breach of fiduciary duty.

188. Rodkey, Andrew, and Paulette were among the shareholders who entered into the Shareholders' Agreement, and were, thus, familiar with its terms.

189. Rodkey, Andrew, and Paulette were also among the directors and shareholders who approved the May 2011 Amendment to Paulaur's Certificate of Incorporation, and were, thus, familiar with its terms and its effect.

190. As a result of the May 2011 Amendment to Paulaur's Certificate of Incorporation, Rodkey's and Andrew's respective Class B stock was reclassified as "common stock."

191. As a result of the May 2011 Amendment to Paulaur's Certificate of Incorporation, any Class A stock held by Paulette ceased to exist.

192. Before Stefaniak presented Heather with the Stock Buy-Back Proposal, Paulaur's other directors, Rodkey, Andrew, and Paulette, must have approved of presenting Heather with it. Thus, Rodkey, Andrew and Paulette knew of, and substantially assisted in, Stefaniak's breach of fiduciary duty.

193. On or about November 12, 2014, Heather thanked Rodkey for what Stefaniak had represented to her were "generous" buyout terms.

194. In thanking Rodkey, Heather expressed her appreciation for his willingness to agree to her receipt of more than what Stefaniak misrepresented she was otherwise entitled to receive under the Shareholders' Agreement.

195. Thus, Rodkey further knew of Stefaniak's breach of fiduciary duty.

196.    Rodkey further gave substantial assistance to Stefaniak's breach of fiduciary duty by: (a) failing to correct Stefaniak's misrepresentation; (b) entering into the Share Purchase Agreement with Heather on November 21, 2014; and (c) consenting to Paulaur's entry into the Share Redemption Agreement with Heather on November 21, 2014.

197.    Prior to November 21, 2014, in the weeks following Michael's death, Andrew told Heather, on multiple occasions, to rely on and trust Stefaniak's advice.

198.    On or about November 11, 2014, Heather thanked Andrew for what Stefaniak had represented to her were "generous" buyout terms.

199.    In thanking Andrew, Heather expressed her appreciation for his willingness to agree to her receipt of more than what Stefaniak misrepresented she was otherwise entitled to receive under the Shareholders' Agreement.

200.    Thus, Andrew further knew of Stefaniak's breach of fiduciary duty.

201.    Andrew further gave substantial assistance to Stefaniak's breach of fiduciary duty by: (a) telling Heather to trust Stefaniak; (b) failing to correct Stefaniak's misrepresentation; and (c) consenting to Paulaur's entry into the Share Redemption Agreement with Heather on November 21, 2014.

202.    Prior to November 11, 2014, in the weeks following Michael's death, Paulette told Heather, on multiple occasions, to rely on and trust Stefaniak's advice.

203.    Paulette further gave substantial assistance to Stefaniak's breach of fiduciary duty by telling Heather to trust Stefaniak.

204.    John Doe Individuals 1-10, individuals presently unknown to Heather, knew of, and substantially assisted in, Stefaniak's breach of fiduciary duty.

**WHEREFORE**, Plaintiff, Heather J. Duncan, demands judgment against Defendants Clifford Rodkey, Andrew Toscano, Paulette Toscano, and John Doe Individuals 1-10 for damages, interest, attorney's fees, filing fees, costs, and any other relief that the Court deems just and appropriate.

## COUNT III

## LEGAL MALPRACTICE

205.    Plaintiff, Heather J. Duncan, repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

206.    At all relevant times, Defendant Megan Thomas, Esq. was an attorney licensed to practice in the State of New Jersey.

207.    At all relevant times, Thomas was an Of Counsel to Defendant Stevens & Lee, P.C., a law firm with a Princeton office.

208.    As of November 6, 2014, an attorney-client relationship existed between, on the one hand, Heather and the Estate of Michael Toscano, and, on the other hand, Thomas and Stevens & Lee.

209.    Thomas agreed to represent Heather and Michael's Estate on November 6, 2014.

210.    Thomas began entering time on November 6, 2014 for legal services on behalf of Heather and Michael's Estate.

211.    As Heather's and Michael's Estate's attorney, Thomas was bound by certain professional obligations under the Rules of Professional Conduct ("RPC").

212.    Thomas had a duty, under RPC 1.3, to act with reasonable diligence in representing Heather and Michael's Estate.

213. Thomas also had a duty, under RPC 2.1, to exercise independent professional judgment and render candid and sound advice to Heather and Michael's Estate.

214. Thomas also had a duty to obtain the best possible price for the Estate's assets, including Michael's interest in Paulaur Corporation.

215. Thomas also had a duty to advise Heather and Michael's Estate as to any conflicts of interest that would require them to obtain separate counsel.

216. On November 11, 2014, Thomas and Stevens & Lee breached the aforementioned duties, and others, in advising Heather and Michael's Estate that the Amended and Restated Shareholders' Agreement dated May 1, 2006 predetermined the terms of any sale of Michael Toscano's interest in Paulaur, including the purchase price.

217. Thomas was negligent in advising Heather and Michael's Estate that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

218. Ethically, Thomas was not in a position to advise Heather and Michael's Estate in connection with the sale of Michael's interest in Paulaur.

219. Thomas's firm, Stevens & Lee, prepared the Shareholders' Agreement.

220. Additionally, Stevens & Lee had previously represented a number of Paulaur's shareholders, including Defendant Andrew Toscano.

221. Because Stevens & Lee prepared the Shareholders' Agreement for Paulaur, and because the firm had previously represented a number of Paulaur's shareholders, there were material limitations on Thomas's ability to advise Heather in connection with the Shareholders' Agreement.

222.    Thomas could not provide an independent, objective evaluation of the binding effect of the Shareholders' Agreement, including, without limitation, the price per share set forth therein, since an attorney cannot attack her firm's prior work product while representing another client, particularly when that other client is a party to a transaction with the firm's current or prior client.

223.    Stefaniak's presence in the conference during the entire November 11 meeting further undermined Thomas's objectivity, contrary to Thomas's duty to provide Heather with candid advice under RPC 2.1.

224.    During the November 11 meeting, Thomas never provided Heather with an opportunity to discuss the Shareholders' Agreement outside of Stefaniak's presence; he was in the conference room at all times.  Nor did Thomas ever ask Stefaniak to leave the conference from.

225.    During the November 11 meeting, Thomas never provided Heather with an opportunity to discuss the terms of the Stock Buy-Back Proposal.

226.    Instead, during the November 11 meeting, Thomas provided legal advice to Heather that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

227.    During the November 11 meeting, Thomas also repeatedly advised Heather that she could trust Stefaniak

228.    Remarkably, Thomas left the conference room just before Stefaniak presented Heather with the Stock Buy-Back Proposal, even after Heather requested that Thomas stay.

229.    Before leaving the conference room, Thomas advised Heather that the Stock Buy-Back Proposal was "generous."

230.     Thomas further advised Heather that Heather would be well taken care of under the Stock Buy-Back Proposal.

231.     And Thomas further advised Heather that Heather would be pleased with the Stock Buy-Back Proposal.

232.     Thomas never advised Heather of any conflict of interest in connection with providing advice about the Shareholders' Agreement or the terms of any sale of Michael's interest in Paulaur.

233.     Thomas never advised Heather to retain separate counsel to provide advice about the Shareholders' Agreement or the terms of any sale of Michael's interest in Paulaur.

234.     Had Thomas informed Heather of her conflict of interest, Heather would have retained separate counsel to provide advice about the Shareholders' Agreement and the terms of any sale of Michael's interest in Paulaur.

235.     Heather instead relied on the advice of Thomas and Stevens & Lee about the binding effect of the Shareholders' Agreement, including the purchase price per share set forth therein, and the Stock-Buy-Back Proposal, which led Heather to believe that she could not negotiate a better price for Michael's interest in Paulaur, and, thus, entered into the Share Purchase Agreement and Share Redemption Agreement on November 21, 2014.

236.     Under the Share Purchase Agreement and Share Redemption Agreement, Heather received far less for Michael's interest in Paulaur than it was worth.

237.     John Doe Individuals 1-10 and John Doe Corporations 1-10, all presently unknown to Heather, participated in the aforesaid legal malpractice.

**WHEREFORE**, Plaintiff, Heather J. Duncan, demands judgment against Defendants Megan Thomas, Esq., Stevens & Lee, P.C., John Doe Individuals 1-10, and John Doe Corporations

1-10 for damages, interest, filing fees, attorney's fees, costs, and any other relief that the Court deems just and appropriate.

## COUNT IV

### VIOLATION OF § 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. § 78j(b), AND RULE 10b-5 PROMULGATED THEREUNDER, 17 C.F.R. § 240.10b-5

238.    Plaintiff, Heather J. Duncan, repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

239.    At the time of Michael Toscano's death, his fellow directors at Defendant Paulaur Corporation included Defendants Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, and Paulette Toscano.

240.    At the time of Michael's death, his fellow shareholders at Paulaur were Stefaniak, Rodkey, and Andrew.

241.    Stefaniak, Rodkey, Andrew, and Paulette all entered into the Amended and Restated Shareholders' Agreement, on or about May 1, 2006, and were, thus, familiar with its terms.

242.    Stefaniak, Rodkey, Andrew, and Paulette all approved the Certificate of Amendment to Paulaur's Certification of Incorporation, on May 31, 2011, and were, thus, familiar with its terms and the consequences of such approval.

243.    As Michael's fellow directors and/or shareholders, Stefaniak, Rodkey, Andrew, and Paulette each owed Michael, and anyone standing in Michael's shoes, including his Executrix, Heather, a fiduciary duty of the utmost good faith any loyalty.

244.    Because Stefaniak, Rodkey, Andrew, and Paulette each owed Heather a fiduciary duty of the utmost good faith and loyalty, they each were in a relationship of trust and confidence

with her. There is an affirmative duty, in such a relationship, to not make misrepresentations and to disclose material facts.

245. Such material facts included the limited scope of the Shareholders' Agreement. On its face, the Shareholders' Agreement granted Paulaur—and only Paulaur—the right to purchase a deceased shareholder's shares. So it did not govern the terms of any sale of a deceased shareholder's interest to another shareholder.

246. The limited scope of the Shareholders' Agreement is a material fact that a reasonable shareholder would consider important. If the Shareholders' Agreement instead governed the terms of any sale of a deceased shareholder's interest, regardless of the purchaser, it would have made sense to accept any buyout proposal from a fellow shareholder providing the seller with an amount greater than that which she would otherwise receive under the Shareholders' Agreement.

247. Another such material fact is that, at the time of Michael's death, the purchase price set forth in the Certificate of Value dated May 1, 2006 appended to the Shareholders' Agreement was no longer binding. That purchase price applied only to Class A and Class B stock. But the May 2011 Amendment to Paulaur's Certificate of Incorporation reclassified all outstanding stock as "common stock." The Certificate of Value did not set a purchase price for such "common stock."

248. The nonbinding effect of the purchase price set forth in the Certificate of Value appended to the Shareholders' Agreement, at the time of Michael's death, is a material fact that a reasonable shareholder would consider important. If that purchase price instead applied to "common stock," it would have made sense to accept any buyout proposal providing the seller

with an amount greater than that which she would otherwise receive under the Shareholders' Agreement.

249.     Yet another such material fact is that, following the approval of the May 2011 Amendment to Paulaur's Certificate of Incorporation, it was impossible to set a purchase price for "common stock," pursuant to the Shareholders' Agreement, because only Class A shareholders could do so thereunder but no such shareholders existed.

250.     The impossibility of setting a purchase price for "common stock," following the approval of the May 2011 Amendment to Paulaur's Certificate of Incorporation, is a material fact that a reasonable shareholder would consider important.  If a purchase price for "common stock" had been set, it would have minimized the seller's ability to negotiate.

251.     Stefaniak, Rodkey, Andrew, and Paulette each failed to disclose the limited scope of the Shareholders' Agreement, the nonbinding effect of the purchase price set forth in the Certificate of Value appended thereto, and the impossibility of setting a purchase price for "common stock" thereunder, contrary to their affirmative duty to do so.

252.     Additionally, Stefaniak misstated those material facts when, on November 11, 2014, he misrepresented to Heather that a shareholders' agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

253.     Stefaniak, Rodkey, Andrew, and Paulette each acted with scienter, as they had a motive and an opportunity to commit fraud.

254.     Stefaniak's motive to commit fraud was:  (a) financial—he intended to, and did, purchase common stock once belonging to Michael at a price far below fair value, and, as one of Paulaur's shareholders, he also intended to, and did, benefit from Paulaur purchasing common stock once belonging to Michael at a price far below fair value; and (b) to increase and preserve

his power—he intended to, and did, increase his interest in Paulaur and ensure that Michael's interest was not sold to a hostile party.

255. Stefaniak's opportunity to commit fraud arose from, among other things: (a) the knowledge he possessed, and the powers he could exercise, as Paulaur's Vice President of Finance and Chief Financial Officer; (b) the powers he could exercise as one of Paulaur's shareholders; (c) the knowledge he possessed of Heather's finances, which he gleaned as her financial advisor and tax preparer; (d) his advising Heather to retain Defendant Megan Thomas, an attorney he knew was an Of Counsel to the same law firm that prepared the Shareholders' Agreement, Defendant Stevens & Lee, P.C.; (e) his meeting with Heather on November 11, 2014; (f) his urging Heather to execute the Share Redemption Agreement and Share Purchase Agreement on November 21, 2014; and (g) his seeming friendship with Heather.

256. Rodkey's motive to commit fraud was: (a) financial—he intended to, and did, purchase common stock once belonging to Michael at a price far below fair value, and, as one of Paulaur's shareholders, he also intended to, and did, benefit from Paulaur purchasing common stock once belonging to Michael at a price far below fair value; and (b) to increase and preserve his power—he intended to, and did, increase his interest in Paulaur and ensure that Michael's interest was not sold to a hostile party.

257. Rodkey's opportunity to commit fraud arose from, among other things: (a) the knowledge he possessed, and the powers he could exercise, as Paulaur's Vice President of Quality Assurance; (b) the powers he could exercise as one of Paulaur's shareholders; and (c) the phone call he received from Heather on or about November 12, 2014.

258. Andrew's motive to commit fraud was: (a) financial—as one of Paulaur's shareholders, he intended to, and did, benefit from Paulaur purchasing common stock once

belonging to Michael at a price far below fair value; and (b) to preserve his power—he intended to, and did, ensure that Michael's interest was not sold to a hostile party.

259. Andrew's opportunity to commit fraud arose from, among other things: (a) the knowledge he possessed, and the powers he could exercise, as Paulaur's Vice President of Manufacturing; (b) the powers he could exercise as one of Paulaur's shareholders; (c) his urging Heather to trust Stefaniak on multiple occasions before November 11, 2014; (d) his phone call with Heather on or about November 11, 2014; and (e) his familial relationship with Heather.

260. Paulette's motive to commit fraud was to preserve her power—she intended to, and did, ensure that Michael's interest in Paulaur was not sold to a hostile party.

261. Paulette's opportunity to commit fraud arose from, among other things: (a) the knowledge she possessed, and the powers she could exercise, as Paulaur's President; (b) her urging Heather to trust Stefaniak on multiple occasions before November 11, 2014; (c) her urging Heather to execute the Share Redemption Agreement and Share Purchase Agreement on November 21, 2014; and (d) her familial relationship with Heather.

262. The antagonistic behavior of Stefaniak, Rodkey, Andrew, and Paulette on November 21, 2014 further confirms that they each acted with scienter. After Heather executed the Share Redemption Agreement and Share Purchase Agreement, they shut her out of their conversations and ignored her.

263. The fraud perpetrated by Stefaniak, Rodkey, Andrew, and Paulette occurred in connection with the purchase or sale of a security.

264. The Paulaur common stock once owned by Michael falls within the broad definition of "security" set forth in the Securities Exchange Act of 1934.

265. Had Stefaniak not misrepresented that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, Heather would not have entered into the Share Redemption Agreement and Share Purchase Agreement, thereby selling Michael's interest for less than it was worth.

266. Had Stefaniak, Rodkey, Andrew, and Paulette not failed to disclose the limited scope of the Shareholders' Agreement, the nonbinding effect of the purchase price set forth in the Certificate of Value appended thereto, and the impossibility of setting a purchase price for "common stock" thereunder, Heather would not have entered into the Share Redemption Agreement and Share Purchase Agreement, thereby selling Michael's interest in Paulaur for less than it was worth.

267. When Heather entered into the Share Redemption Agreement and Share Purchase Agreement, she reasonably relied on Stefaniak's representation that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

268. Likewise, when Heather entered into the Share Redemption Agreement and Share Purchase Agreement, she reasonably relied on the omissions of Stefaniak, Rodkey, Andrew, and Paulette, which had led her to conclude that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

269. Heather's reliance was reasonable given: (a) the fiduciary relationship that existed between, on the one hand, Heather and, on the other hand, Stefaniak, Rodkey, Andrew, and Paulette; (b) the longstanding personal and/or familial relationships that existed between, on the one hand, Heather and, on the other hand, Stefaniak, Rodkey, Andrew, and Paulette; (c) the advice Heather received from her attorney, Thomas; (d) Heather's lack of access, at the time of the transaction, to the May 2011 Amendment to Paulaur's Certification of Incorporation, which

reclassified Michael's Class B stock to "common stock"; (e) Heather's lack of sophistication with respect to corporate governance; and (f) Heather's state of mind at the time she entered into the transaction—she was still grieving over the recent, unexpected loss of her husband.

270. Heather's reliance was the proximate cause of her injury. Heather would not have entered into the Share Redemption Agreement and Share Purchase Agreement, thereby selling Michael's interest in Paulaur for less than it was worth, but for her reliance on the misrepresentations and omissions about the Shareholders' Agreement that had led her to conclude she was not free to negotiate a better deal.

271. At all relevant times, Stefaniak was acting on behalf of not only himself, but also Paulaur. Thus, Paulaur likewise made both a misstatement and omission of material fact with scienter in connection with the purchase or sale of a security upon which Heather reasonably relied, and Heather's reliance was the proximate cause of her injury.

272. John Doe Individuals 1-10 and John Doe Corporations 1-10, all presently unknown to Heather, participated in the aforesaid violations.

**WHEREFORE**, Plaintiff, Heather J. Duncan, demands judgment against Defendants Paulaur Corporation, Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, Paulette Toscano, John Doe Corporations 1-10, and John Doe Individuals 1-10 for damages, interest, attorney's fees, filing fees, costs, and any other relief that the Court deems just and appropriate.

<u>**COUNT V**</u>

**VIOLATION OF THE NEW JERSEY UNIFORM SECURITIES LAW, N.J.S.A. 49:3-47 TO -83**

273. Plaintiff, Heather J. Duncan, repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

274. As Michael Toscano's fellow directors and shareholders, Defendants Mitchell Stefaniak and Clifford Rodkey each owed Michael, and anyone standing in Michael's shoes, including his Executrix, Heather, a fiduciary duty of the utmost good faith any loyalty.

275. Because Stefaniak and Rodkey each owed Heather a fiduciary duty of the utmost good faith and loyalty, they each were in a relationship of trust and confidence with her. There is an affirmative duty, in such a relationship, to not make misrepresentations and to disclose material facts.

276. Such material facts included the limited scope of the Shareholders' Agreement. On its face, the Shareholders' Agreement granted Paulaur—and only Paulaur—the right to purchase a deceased shareholder's shares. So it did not govern the terms of any sale of a deceased shareholder's interest to another shareholder, such as Stefaniak or Rodkey.

277. The limited scope of the Shareholders' Agreement is a material fact that a reasonable shareholder would consider important. If the Shareholders' Agreement instead governed the terms of any sale of a deceased shareholder's interest, regardless of the purchaser, it would have made sense to accept any buyout proposal from a fellow shareholder providing the seller with an amount greater than that which she would otherwise receive under the Shareholders' Agreement.

278. Another such material fact is that, at the time of Michael's death, the purchase price set forth in the Certificate of Value dated May 1, 2006 appended to the Shareholders' Agreement was no longer binding. That purchase price applied only to Class A and Class B stock. But the May 2011 Amendment to Paulaur's Certificate of Incorporation reclassified all outstanding stock as "common stock." The Certificate of Value did not set a purchase price for such "common stock."

279.     The nonbinding effect of the purchase price set forth in the Certificate of Value appended to the Shareholders' Agreement, at the time of Michael's death, is a material fact that a reasonable shareholder would consider important.  If that purchase price instead applied to "common stock," it would have made sense to accept any buyout proposal providing the seller with an amount greater than that which she would otherwise receive under the Shareholders' Agreement.

280.     Yet another such material fact is that, following the approval of the May 2011 Amendment to Paulaur's Certificate of Incorporation, it was impossible to set a purchase price for "common stock," pursuant to the Shareholders' Agreement, because only Class A shareholders could do so thereunder but no such shareholders existed.

281.     The impossibility of setting a purchase price for "common stock," following the approval of the May 2011 Amendment to Paulaur's Certificate of Incorporation, is a material fact that a reasonable shareholder would consider important.  If the purchase price for such "common stock" had been set, it would have minimized the seller's ability to negotiate.

282.     Heather did not know of the limited scope of the Shareholders' Agreement, the nonbinding effect of the purchase price set forth in the Certificate of Value appended thereto, and the impossibility of setting a purchase price for "common stock" thereunder.

283.     Stefaniak and Rodkey each failed to disclose the limited scope of the Shareholders' Agreement, the nonbinding effect of the purchase price set forth in the Certificate of Value appended thereto, and the impossibility of setting a purchase price for "common stock" thereunder, contrary to their affirmative duty to do so.

284.    Additionally, Stefaniak misstated those material facts when, on November 11, 2014, he misrepresented to Heather that a shareholders' agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

285.    Stefaniak and Rodkey each acted with scienter, as they had a motive and an opportunity to commit fraud.

286.    Stefaniak's motive to commit fraud was:  (a) financial—he intended to, and did, purchase common stock once belonging to Michael at a price far below fair value, and, as one of Paulaur's shareholders, he also intended to, and did, benefit from Paulaur purchasing common stock once belonging to Michael at a price far below fair value; and (b) to increase and preserve his power—he intended to, and did, increase his interest in Paulaur and ensure that Michael's interest was not sold to a hostile party.

287.    Stefaniak's opportunity to commit fraud arose from, among other things:  (a) the knowledge he possessed, and the powers he could exercise, as Paulaur's Vice President of Finance and Chief Financial Officer; (b) the powers he could exercise as one of Paulaur's shareholders; (c) the knowledge he possessed of Heather's finances, which he gleaned as her financial advisor and tax preparer; (d) his advising Heather to retain Defendant Megan Thomas, even though he knew she was an Of Counsel to the same law firm that prepared the Shareholders' Agreement, Defendant Stevens & Lee, P.C.; (e) his meeting with Heather on November 11, 2014; (f) his urging Heather to execute the Share Redemption Agreement and Share Purchase Agreement on November 21, 2014; and (g) his seeming friendship with Heather.

288.    Rodkey's motive to commit fraud was:  (a) financial—he intended to, and did, purchase common stock once belonging to Michael at a price far below fair value, and, as one of Paulaur's shareholders, he also intended to, and did, benefit from Paulaur purchasing common

stock once belonging to Michael at a price far below fair value; and (b) to increase and preserve his power—he intended to, and did, increase his interest in Paulaur and ensure that Michael's interest was not sold to a hostile party.

289. Rodkey's opportunity to commit fraud arose from, among other things: (a) the knowledge he possessed, and the powers he could exercise, as Paulaur's Vice President of Quality Assurance; (b) the powers he could exercise as one of Paulaur's shareholders; and (c) the phone call he received from Heather on or about November 12, 2014.

290. The antagonistic behavior of Stefaniak and Rodkey on November 21, 2014 further confirms that they each acted with scienter. After Heather executed the Share Redemption Agreement and Share Purchase Agreement, they shut her out of their conversations and ignored her.

291. The fraud perpetrated by Stefaniak and Rodkey occurred in connection with the purchase or sale of a security.

292. The Paulaur common stock once owned by Michael falls within the broad definition of "security" set forth in the Securities Exchange Act of 1934.

293. Had Stefaniak not misrepresented that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, Heather would not have entered into the Share Redemption Agreement and Share Purchase Agreement, thereby selling Michael's interest for less than it was worth.

294. Had Stefaniak and Rodkey not failed to disclose the limited scope of the Shareholders' Agreement, the nonbinding effect of the purchase price set forth in the Certificate of Value appended thereto, and the impossibility of setting a purchase price for "common stock"

thereunder, Heather would not have entered into the Share Redemption Agreement and Share Purchase Agreement, thereby selling Michael's interest in Paulaur for less than it was worth.

295. Heather suffered a loss when Stefaniak and Rodkey defrauded her into selling Michael's interest in Paulaur for less than it was worth.

296. Heather was in privity with Stefaniak and Rodkey because she entered into the Share Purchase Agreement with them on November 21, 2014.

297. At all relevant times, Stefaniak was acting on behalf of not only himself, but also Paulaur. Thus, Paulaur likewise made both a misstatement and omission of material fact with scienter in connection with the purchase or sale of a security that caused to Heather to suffer a loss.

298. Heather was in privity with Paulaur because she entered into the Share Redemption Agreement with it on November 21, 2014.

299. John Doe Individuals 1-10 and John Doe Corporations 1-10, all presently unknown to Heather, participated in the aforesaid violations.

**WHEREFORE**, Plaintiff, Heather J. Duncan, demands judgment against Defendants Paulaur Corporation, Mitchell Stefaniak, Clifford Rodkey, John Doe Corporations 1-10, and John Doe Individuals 1-10 for damages, interest, attorney's fees, filing fees, costs, and any other relief that the Court deems just and appropriate.

## COUNT VI

## COMMON LAW FRAUD

300. Plaintiff, Heather J. Duncan, repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

301. The limited scope of the Amended and Restated Shareholders' Agreement dated May 1, 2006 was a material fact. On its face, the Shareholders' Agreement granted Defendant

Paulaur Corporation—and only Paulaur—the right to purchase a deceased shareholder's shares. So it did not govern the terms of any sale of a deceased shareholder's interest to another shareholder.

302. Another material fact is that, at the time of Michael Toscano's death, the purchase price set forth in the Certificate of Value dated May 1, 2006 appended to the Shareholders' Agreement was no longer binding. That purchase price applied only to Class A and Class B stock. But the May 2011 Amendment to Paulaur's Certificate of Incorporation reclassified all outstanding stock as "common stock." The Certificate of Value did not set a purchase price for such "common stock."

303. And yet another material fact is that, following the approval of the May 2011 Amendment to Paulaur's Certificate of Incorporation, it was impossible to set a purchase price for "common stock," pursuant to the Shareholders' Agreement," because only Class A shareholders could do so thereunder but no such shareholders existed.

304. Defendants Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, and Paulette Toscano each failed to disclose the limited scope of the Shareholders' Agreement, the nonbinding effect of the purchase price set forth in the Certificate of Value appended thereto, and the impossibility of setting a purchase price for "common stock" thereunder.

305. Additionally, Stefaniak misstated those material facts when, on November 11, 2014, he misrepresented to Heather that a shareholders' agreement predetermined the terms of any sale of Michael's interest in Paulaur.

306. Stefaniak, Rodkey, Andrew, and Paulette each knew of the limited scope of the Shareholders' Agreement, the nonbinding effect of the purchase price set forth in the Certificate of Value thereto, and the impossibility of setting a purchase price for "common stock" thereunder.

They were each a party to the Shareholders' Agreement, and were, thus, familiar with its terms. They were also among the persons who approved the Certificate of Amendment to Paulaur's Certification of Incorporation, on May 31, 2011, and were, thus, familiar with its terms and the consequences of such approval.

307.     Stefaniak, Rodkey, Andrew, and Paulette each intended that Heather rely on their material misstatements and/or omissions. They sought to convince Heather that the Stock Buy-Back Proposal was generous by comparing it to what they claimed she was otherwise obligated to receive under the Shareholders' Agreement.

308.     When Heather entered into the Share Redemption Agreement and Share Purchase Agreement, she reasonably relied on Stefaniak's representation that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

309.     Likewise, when Heather entered into the Share Redemption Agreement and Share Purchase Agreement, she reasonably relied on the omissions of Stefaniak, Rodkey, Andrew, and Paulette, which had led her to conclude that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

310.     Heather's reliance was reasonable given: (a) the fiduciary relationship that existed between, on the one hand, Heather and, on the other hand, Stefaniak, Rodkey, Andrew, and Paulette; (b) the longstanding personal and/or familial relationships that existed between, on the one hand, Heather and, on the other hand, Stefaniak, Rodkey, Andrew, and Paulette; (c) the advice Heather received from her attorney, Thomas; (d) Heather's lack of access, at the time of the transaction, to the May 2011 Amendment to Paulaur's Certification of Incorporation, which reclassified Michael's Class B stock to "common stock"; (e) Heather's lack of sophistication with

respect to corporate governance; and (f) Heather's state of mind at the time she entered into the transaction—she was still grieving over the recent, unexpected loss of her husband.

311.    Had Stefaniak not misrepresented that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, Heather would not have entered into the Share Redemption Agreement and Share Purchase Agreement, thereby selling Michael's interest for less than it was worth.

312.    Had Stefaniak, Rodkey, Andrew, and Paulette not failed to disclose the limited scope of the Shareholders' Agreement, the nonbinding effect of the purchase price set forth in the Certificate of Value appended thereto, and the impossibility of setting a purchase price for "common stock" thereunder, Heather would not have entered into the Share Redemption Agreement and Share Purchase Agreement, thereby selling Michael's interest in Paulaur for less than it was worth.

313.    At all relevant times, Stefaniak was acting on behalf of not only himself, but also Paulaur.  Thus, Paulaur likewise made a material misrepresentation and/or omission of a presently existing fact with knowledge of its falsity and with the intent that Heather rely on it.  Heather did in fact rely on that material misrepresentation and/or omission, which caused her to suffer a loss.

314.    John Doe Individuals 1-10 and John Doe Corporations 1-10, all presently unknown to Heather, participated in the aforesaid fraud.

**WHEREFORE**, Plaintiff, Heather J. Duncan, demands judgment against Defendants Paulaur Corporation, Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, Paulette Toscano, John Doe Corporations 1-10, and John Doe Individuals 1-10 for damages, interest, attorney's fees, filing fees, costs, and any other relief that the Court deems just and appropriate.

## COUNT VII

## EQUITABLE FRAUD

315.    Plaintiff, Heather J. Duncan, repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

316.    The limited scope of the Amended and Restated Shareholders' Agreement dated May 1, 2006 was a material fact.  On its face, the Shareholders' Agreement granted Defendant Paulaur Corporation—and only Paulaur—the right to purchase a deceased shareholder's shares. So it did not govern the terms of any sale of a deceased shareholder's interest to another shareholder.

317.    Another material fact is that, at the time of Michael Toscano's death, the purchase price set forth in the Certificate of Value dated May 1, 2006 appended to the Shareholders' Agreement was no longer binding.  That purchase price applied only to Class A and Class B stock. But the May 2011 Amendment to Paulaur's Certificate of Incorporation reclassified all outstanding stock as "common stock."  The Certificate of Value did not set a purchase price for such "common stock."

318.    And yet another material fact is that, following the approval of the May 2011 Amendment to Paulaur's Certificate of Incorporation, it was impossible to set a purchase price for "common stock," pursuant to the Shareholders' Agreement," because only Class A shareholders could do so thereunder but no such shareholders existed.

319.    Defendants Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, and Paulette Toscano each failed to disclose the limited scope of the Shareholders' Agreement, the nonbinding effect of the purchase price set forth in the Certificate of Value appended thereto, and the impossibility of setting a purchase price for "common stock" thereunder.

320. Additionally, Stefaniak misstated those material facts when, on November 11, 2014, he misrepresented to Heather that a shareholders' agreement predetermined the terms of any sale of Michael's interest in Paulaur.

321. Stefaniak, Rodkey, Andrew, and Paulette each intended that Heather rely on their material misstatements and/or omissions. They sought to convince Heather that the Stock Buy-Back Proposal was generous by comparing it to what they claimed she would otherwise receive under the Shareholders' Agreement.

322. When Heather entered into the Share Redemption Agreement and Share Purchase Agreement—and, thereby, accepted the Stock Buy-Back Proposal—she reasonably relied on Stefaniak's representation that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

323. Likewise, when Heather entered into the Share Redemption Agreement and Share Purchase Agreement—and, thereby, accepted the Stock Buy-Back Proposal—she reasonably relied on the omissions of Stefaniak, Rodkey, Andrew, and Paulette, which had led her to conclude that the Shareholders' Agreement predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price.

324. Heather's reliance was reasonable given: (a) the fiduciary relationship that existed between, on the one hand, Heather and, on the other hand, Stefaniak, Rodkey, Andrew, and Paulette; (b) the longstanding personal and/or familial relationships that existed between, on the one hand, Heather and, on the other hand, Stefaniak, Rodkey, Andrew, and Paulette; (c) the advice Heather received from her attorney, Thomas; (d) Heather's lack of access, at the time of the transaction, to the May 2011 Amendment to Paulaur's Certification of Incorporation, which reclassified Michael's Class B stock to "common stock"; (e) Heather's lack of sophistication with

respect to corporate governance; and (f) Heather's state of mind at the time she entered into the transaction—she was still grieving over the recent, unexpected loss of her husband.

325.    Such reliance was to Heather's detriment because it caused her to sell Michael's interest in Paulaur for less than fair value.

326.    At all relevant times, Stefaniak was acting on behalf of not only himself, but also Paulaur.  Thus, Paulaur likewise made a material misrepresentation and/or omission of a presently existing fact with the intent that Heather rely on it, which she did to her detriment.

327.    John Doe Individuals 1-10 and John Doe Corporations 1-10, all presently unknown to Heather, participated in the aforesaid fraud.

**WHEREFORE**, Plaintiff, Heather J. Duncan, demands judgment against Defendants Paulaur Corporation, Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, Paulette Toscano, John Doe Corporations 1-10, and John Doe Individuals 1-10 setting aside the Share Redemption Agreement and Share Purchase in addition to any other equitable relief the Court deems just and appropriate.

## COUNT VIII

### CIVIL CONSPIRACY

328.    Plaintiff, Heather J. Duncan, repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

329.    Defendants Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, and Paulette Toscano worked in combination, as directors of Defendant Paulaur Corporation, to defraud Heather into selling Michael's interest in Paulaur at a price far below fair value.

330.    In perpetrating such fraud, Stefaniak, Rodkey, Andrew, and Paulette had a common design and unlawful purpose:  to deceive Heather into concluding that a shareholders' agreement

predetermined the terms of any sale of Michael's interest in Paulaur, including the purchase price, and to then furnish Heather with better terms, *i.e.*, the Stock Buy-Back Proposal, that she would conclude she had no choice but to accept.

331.    The Stock Buy-Back Proposal was implemented through two documents:  (1) the Share Redemption Agreement; and (2) the Share Purchase Agreement.

332.    In furtherance of their common design, Stefaniak, Rodkey, Andrew, and Paulette each executed the Unanimous Consent in Lieu of a Meeting of Board of Directors of Paulaur Corporation.  In doing so, each approved of the Share Redemption Agreement, an integral part of the Stock Buy-Back Proposal.

333.    Stefaniak, Rodkey, and Paulette were present when Heather executed the Share Redemption Agreement and Share Purchase Agreement.  In fact, Stefaniak and Paulette urged Heather to sign both agreements.

334.    Because of Stefanik's, Rodkey's, Andrew's, and Paulette's conspiracy, Heather suffered special damages.  She sold Michael's interest in Paulaur for less than she otherwise would have sold it for.

335.    At all relevant times, Stefaniak was acting on behalf of not only himself, but also Paulaur.  Thus, Paulaur likewise participated in a civil conspiracy.

336.    John Doe Individuals 1-10 and John Doe Corporations 1-10, all presently unknown to Heather, participated in the aforesaid conspiracy.

**WHEREFORE**, Plaintiff, Heather J. Duncan, demands judgment against Defendants Paulaur Corporation, Mitchell Stefaniak, Clifford Rodkey, Andrew Toscano, Paulette Toscano, John Doe Corporations 1-10, and John Doe Individuals 1-10 for damages, interest, attorney's fees, filing fees, costs, and any other relief that the Court deems just and appropriate.

## COUNT IX

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
### AND FAIR DEALING

337.     Plaintiff, Heather J. Duncan, repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

338.     Michael Toscano was among the shareholders of Defendant Paulaur Corporation who entered into the Shareholders' Agreement.

339.     When Michael entered into the Shareholders' Agreement, in May 2006, he had a justified expectation that Paulaur's Class A shareholders, including Defendant Paulette Toscano, would periodically meet with Paulaur's Chief Financial Officer, Defendant Mitchell Stefaniak, to consider a change in the "initial purchase price" and set a new, updated purchase price for his Class B stock.

340.     Upon information and belief, Paulette and Stefaniak never held such a meeting. Thus, although the purchase price set forth in the Certificate of Value appended to the Shareholders' Agreement was not binding at the time of Michael's death, if, inexplicably, it was, it became stale well before then.

341.     In failing to set a new, updated purchase price, Paulette and Stefaniak failed to exercise their discretion in good faith.

342.     In failing to set a new, updated purchase price, Paulette and Stefaniak acted inequitably.

343.     In failing to set a new, updated purchase price, Paulette and Stefaniak acted with ill motives.

344.     In failing to set a new, updated purchase price, Paulette and Stefaniak acted without any legitimate purpose.

345.     John Doe Individuals 1-10 and John Doe Corporations 1-10, all presently unknown to Heather, likewise breached the implied covenant of good faith and fair dealing.

**WHEREFORE**, Plaintiff, Heather J. Duncan, demands judgment against Defendants Mitchell Stefaniak, Paulette Toscano, John Doe Corporations 1-10, and John Doe Individuals 1-10 for damages, interest, attorney's fees, filing fees, costs, and any other relief that the Court deems just and appropriate.

**JURY DEMAND**

Plaintiff, Heather J. Duncan, demands trial by jury on all issues so triable.

Dated: October 14, 2016          By:     s/ Frederick B. Polak
                                         Frederick B. Polak, Esq.
                                         POST, POLAK, GOODSELL &
                                         STRAUCHLER, P.A.
                                         FREDERICK B. POLAK
                                           fpolak@postpolak.com
                                         MICHAEL J. MARTELO
                                           mmartelo@postpolak.com
                                         425 Eagle Rock Avenue, Suite 200
                                         Roseland, New Jersey 07068-1717
                                         T. (973) 228-9900
                                         F. (973) 994-1705